## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS,

      Plaintiff,

vs.                                                Civ. No. 21-259 KK/JHR

TOWN OF MESILLA, NEW MEXICO
and TOWN OF MESILLA BOARD OF
TRUSTEES,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on: (1) Appellant's Statement of Appellate Issues (Doc. 9) ("Statement"), filed May 24, 2021; and, (2) Plaintiff's Motion for Summary Judgment and for Expedited Treatment under 47 U.S.C. § 332(c)(7)(B)(v) (Doc. 29) ("Motion"), filed August 30, 2021. Having reviewed the parties' submissions, the record, and the relevant law, and for the reasons set forth below, the Court FINDS that Plaintiff's Motion is well-taken in part and should be GRANTED IN PART and DENIED IN PART as set forth below. The Court further FINDS that Plaintiff's appeal under N.M. Stat. Ann. § 39-3-1.1 should be DENIED AS MOOT.

## I.    Factual Background and Procedural History[1]

Plaintiff Cellco Partnership d/b/a Verizon Wireless filed this action following Defendants' denial of its application for a special use permit to build a cell phone tower in Mesilla, New Mexico. (Doc. 1.) Defendants are the Town of Mesilla, New Mexico ("Town") and its Board of Trustees ("Board"). (*Id.*) In its Complaint, Plaintiff asserts three causes of action. (*Id.* at 21-25.) The first

---

[1] The facts in this section are drawn from the record on appeal (Doc. 10-1), the contents of which are undisputed.

two are brought under 47 U.S.C. § 332(c)(7) of the Telecommunications Act ("TCA"), and the third appeals Defendants' zoning decision under N.M. Stat. Ann. § 39-3-1.1. (*Id.*)

On October 21, 2020, Plaintiff applied for a special use permit to build a 65-foot "mono pine" cell phone tower in Mesilla, New Mexico.[2] (Doc. 10-1 at 20.)[3] In its application, Plaintiff proposed to build the "LSC La Posta" tower on the property of Susan Krueger at 1584 West Boutz Road. (*Id.* at 20, 22, 28, 325.) Ms. Krueger and Plaintiff's Senior Site Acquisition Manager Les F. Gutierrez signed the application, which proffered the following justification for the tower: "[t]he new telecom facility is needed to provide expanded data and voice services to nearby homes, vehicular traf[f]ic, and 911 users." (*Id.* at 20, 22.) Plaintiff also submitted documents to support the application, including propagation maps purporting to "show[] before and after coverage improvement of [the] new facility" and "[p]hoto-[s]imulations showing before and after." (*Id.* at 22; *see id.* at 23-27.)

The Town's Planning, Zoning, and Historical Appropriateness Commission ("PZHAC") received three letters in opposition to the proposed tower. (*Id.* at 75, 95, 97.) One of the letters came from David and Tara Binns, the owners of the property next door, who objected that the tower would be "basically in [their] backyard" and would "lower[ their property] value" and "obstruct[]" their "beautiful views." (*Id.* at 75.) The Binns also asserted that the tower would violate a protective covenant governing their property and Ms. Krueger's.[4] (*Id.*) Others residing within view of the

---

[2] The term "mono pine" appears to indicate that the tower would consist of a single pole and resemble a pine tree. (*See, e.g.*, Doc. 10-1 at 26-27, 35-36.)

[3] Citations to Docket No. 10-1 are to the Bates-stamped, 332-page record on appeal, filed May 26, 2021. (Doc. 10-1.) The Court notes that Plaintiff also attached the record on appeal to its Statement, its Motion, and its reply in support of the Motion. (Doc. 9-1; Doc. 29-1; Doc. 31-2.) The Court further notes that the record contains significant redundancies, for example, four separate copies of the Protective Covenants for Mesilla Greens Subdivision. (*See* Doc. 10-1 at 77-88, 108-19, 184-95, 201-12.)

[4] The protective covenant to which the Binns referred states: "TOWERS, ETC. No radio or television transmission tower or radio or television receiving towers shall be erected, placed or permitted upon any part of said property.

proposed tower objected on various grounds including "health factors," the existence of other towers, obstructed views, reduced property values, aesthetics, and the protective covenant. (*Id.* at 95, 97.) For example, one resident objected that the tower would "be unsightly in this particular area, against the backdrop of open fields and residential homes." (*Id.* at 97.)

The PZHAC held a meeting on November 16, 2020, at which it considered Plaintiff's application.[5] (*Id.* at 1.) The meeting agenda noted that "[t]he application appears to meet the requirements of the [Mesilla Town] Code for cell towers." (*Id.* at 2.) At the meeting, "[s]taff provided a brief description of the case," and stated "that although the Town cannot enforce covenants and deed restrictions, the Town has referred to them in the past as indicators of how residents wanted to see their part of Town develop." (*Id.* at 99.) All speakers at the meeting were sworn in. (*Id.*) Mr. Gutierrez "[e]xplained the need for the tower and described what a 'mono-pine' tower is." (*Id.*) Eight area residents, including the Binns, objected on the bases of health issues, aesthetics, reduced property values, obstructed views, the protective covenant, noise, risk of fire, and possible future expansion of the facility. (*Id.* at 99-100.) For example, one resident asserted that "the tower would not be historical and would be out of character with Mesilla"; another stated that the Town did not need a "65[-]foot fake Christmas tree." (*Id.*)

Responding to residents' objections, Mr. Gutierrez stated that health reasons could not be used to justify denial of the requested permit, and that "the height of the tower co[u]ld possibly be lowered 5-10 feet." (*Id.* at 100.) Ms. Krueger also spoke in favor of the tower, asserting that Plaintiff

---

Satellite dish receivers if erected shall be concealed from view by landscaping or fencing." (Doc. 10-1 at 85.) Plaintiff and the Binns disputed whether the protective covenant had been removed before Plaintiff filed its application. (*Id.* at 122-23, 144-45, 311-12, 320-21.) However, the Board did not deny Plaintiff's application based on the protective covenant, (*see id.* at 331-32), and thus the Court need not determine whether it could properly have done so.

[5] The description of the PZHAC's November 16, 2020 meeting in this section is based on the agenda and minutes in the record on appeal. (*See* Doc. 10-1 at 98-102.) The record does not include a transcript of the meeting.

"has been looking for a location near here for the past fifteen years, and that staff had told [Plaintiff] that towers [a]re allowed in the R[ural] F[arm] zone by the [Mesilla Town Code]." (*Id.*)

The PZHAC voted unanimously against a motion to recommend approval of Plaintiff's application. (*Id.*) The PZHAC issued a resolution memorializing the reasons for its decision, which stated:

> The PZHAC determined from public input, including references by neighboring property owners to a covenant in their deeds restricting towers, that the tower would have negative visual impacts on the immediate area and would be out of character with the historic and aesthetic appeal of the Town.

(*Id.* at 297.) The PZHAC also attached five "findings of fact" to its resolution, *i.e.*, that: (1) it had jurisdiction to review the request; (2) "[t]he zoning code allows this type of use in the R[ural] F[arm] zone"; (3) the tower would "be out of character with the Town's Comprehensive Plan"; (4) the tower would "create a negative impact on the surrounding properties or the Town"; and, (5) the tower would "not be beneficial to the Town." (*Id.* at 298.)

Plaintiff appealed the PZHAC's decision to the Board on December 6, 2020. (*Id.* at 103.) The Board held a *de novo* hearing on Plaintiff's application at a special meeting on February 8, 2021. (*Id.* at 309-10; Doc. 9-2 at 28.) Counsel for Plaintiff and the Town attended. (Doc. 10-1 at 309.) The meeting began with public comments. (*Id.* at 310.) The Town Clerk advised that when a member of the public sought to comment, she would "do an oath," after which the individual should state his or her name and address before speaking. (*Id.*) However, the meeting transcript does not include any oaths being administered to any of the members of the public who spoke at the meeting. (*See id.* at 310-19.) Rather, the Town Clerk read correspondence from Ms. Krueger and Mr. Binns into the record; the Binns and seven other area residents spoke against the proposed tower; and, Ms. Krueger spoke in favor of it.[6] (*Id.*)

---

[6] In the meeting transcript, the Binns' surname is spelled phonetically as "Benz." (Doc. 10-1 at 311-13, 318-19.)

Area residents again proffered several reasons for opposing the proposed tower, including health issues, aesthetics, reduced property values, obstructed views, the protective covenant, noise, risk of fire, risk of property damage, possible expansion of the facility, and nearby schools. (*Id.* at 311-19.) For example, Mr. Binns objected that "[a] 65-foot tower is going to be enormous compared to the pecan trees it's next to." (*Id.* at 312.) Monica Velasquez stated she bought property in the area "for its quietness, for how serene it is, for hearing the church bells in the morning, for the roosters in the morning," and that noise from the tower would impact her. (*Id.* at 314.) Bob Phwam, a home builder as well as an area resident, commented that cell phone towers affect property values, the proposed tower would be very close to downtown Mesilla, and he bought property in the area because of the Town's beauty and the surrounding farmlands. (*Id.* at 316-17.) Mr. Phwam added that he did not want to "look at a 65-foot cell tower." (*Id.* at 317.)

Speaking in favor of the proposed tower, Ms. Krueger stated that, had the Town properly investigated Plaintiff's application, many of the area residents' questions would have been answered and that the protective covenants on the property had been properly removed. (*Id.* at 310-11, 317-18.)

After taking public comments, the Mayor indicated the Town Clerk would "swear everyone in" before Plaintiff presented its case. (*Id.* at 319.) However, the transcript does not reflect that anyone was sworn in before Mr. Gutierrez spoke on Plaintiff's behalf. (*Id.*) Mr. Gutierrez identified Plaintiff's four cell towers nearest the proposed site, ranging from 3,500 feet to 11,000 feet away. (*Id.* at 320.) He then asserted that Plaintiff had "a gap in coverage" and that the four other towers "are bearing the load of [Plaintiff's] customers in the Town of Mesilla and the surrounding areas." (*Id.*) According to Mr. Gutierrez, the new tower would "off-load the traffic to the adjacent sites and provide quality excellent service to all of the town's residents and especially all the 911 users." (*Id.*)

He also stated that nearby Doña Ana County had "approved four new tower sites in 2020 to meet the [de]mand of [Plaintiff's] customers." (*Id.*)

According to Mr. Gutierrez, the PZHAC erred in rejecting Plaintiff's application because: (1) Plaintiff "compiled [sic] all the requirements of the Mesilla Town Code in submitting its application"; (2) Plaintiff "demonstrated that it explored all alternatives and identified Ms. Krueger's property as the best location for this facility"; (3) the protective covenant prohibiting towers on the property had been removed and also did not "mention cell towers"; (4) denying the application based on "generalized expressions of concern about the aesthetics of property value [sic] violates federal law"; and, (5) denying the application based "on unsubstantiated health concerns articulated by several community members . . . also violates federal law." (*Id.* at 321.)

> Mr. Gutierrez reiterated that Plaintiff
>
> has demonstrated that a gap in coverage exists and that the proposed site is the least intrusive available means of addressing such as [sic] this gap. . . . This network in field is needed to ensure coverage, functionality, and the capacity of network in the area making this site of crucial importance to the public, both local to Mesilla, and those folks passing through.

(*Id.*) He subsequently expanded on why Plaintiff chose the site at issue for the proposed tower, stating that

> [t]he area within [which Plaintiff's] facility can effectively be located is quite small. [Plaintiff] has demonstrated it's investigated and considered all possible options within the potential site area and ultimately eliminated all other properties based on their location, zoning, feasibility or availability. The proposed location of 1584 W. Boutz emerged as the only workable site for [Plaintiff].

(*Id.* at 322.) He also observed that "there are two other wireless communications towers . . . about a mile from" the proposed new tower but did not address whether Plaintiff could co-locate or share the use of antennas on existing towers. (*Id.*)

After Mr. Gutierrez concluded his presentation, Mesilla Community Development Coordinator Larry Shannon addressed the Board. (*Id.* at 305, 323.) *Inter alia*, he explained that the PZHAC "didn't vote on the [protective] covenants themselves, but what they voted on was the fact that the covenants indicated what the surrounding property owners were interested in seeing or not seeing happen to properties in their area." (*Id.* at 323.) He identified "the major issue" to be that the proposed tower "would negatively affect the Town of Mesilla because of the impacts created by the visual aspect." (*Id.* at 324.) He stated that there had only been one tower approved under the Town's new ordinance and "the main deciding fact" with respect to that tower was "that it was far away from the historic core." (*Id.*)

At this point in the meeting, the Mayor observed, "we didn't swear in the people." (*Id.*) Asked how she would like to "handle this," the Town Clerk responded, "So I will state the oath, and then if you both will just respond with 'I do,' then you will both be sworn in." (*Id.*) The Town Clerk then asked, "Do you swear to tell the whole truth and nothing but the truth?" An "unidentified male speaker" responded "I do," and Mr. Shannon responded, "I do, and I do swear that what I just stated was the truth." (*Id.*) As the only person other than Mr. Shannon who presented information to the Board during this part of the meeting, Mr. Gutierrez appears to have been the "unidentified male speaker." (*Id.*)

After Mr. Shannon and (presumably) Mr. Gutierrez were sworn in, the Mayor Pro Tem noted that the town code required Plaintiff to submit "documentation for all adjoining, planned, proposed, in service, and existing sites" but she could not find that documentation in the paperwork submitted to the Board, nor could she find "supporting documentation that explains why it's the best site." (*Id.* at 325.) Mr. Gutierrez responded:

> I apologize. It may not have been included. We had in our package, but what was proposed and what we added some time back as part of your original application,

> we did a very thorough what we called an RF engineering analysis. And there were some color maps included in the package. And the first map shows Las Cruces area with no coverage. The second area shows the new cell tower coverage. And then we also added some photo simulations. So when I talked earlier about those four towers that were around there, those are the ones that I was referencing. And the La Posta tower, if you – in your package, if you can find it . . . there is a color map in there that shows the energy produced by that tower. It shows the coverage needed for [Plaintiff].

(*Id.*) He added, "[s]o that map, that color map, shows the signal how it covers throughout that whole area. And that was our justification for the tower site[.]" (*Id.*)

When the Mayor Pro Tem indicated Mr. Gutierrez's response "still d[id]n't answer [her] question" about the missing documentation, Mr. Gutierrez responded, "I apologize. It was included in our original application, and the PZHAC had this information." (*Id.*) However, a Board member then asked, "so Planning and Zoning got everything, and we only got partial?" and Mr. Shannon responded, "[e]verything that I presented to the Planning Commission, I believe I forwarded it to the Board of Trustees." (*Id.* at 326.) The Town Clerk confirmed, "[e]verybody [sic] that was included in the PZHAC packet, along with all correspondence that we received from [Plaintiff], was included in [the Board's] packets." (*Id.*)

After the Town's counsel gave legal advice regarding the Board's authority to grant or deny the application, (*id.* at 327), the Mayor stated that "tourism" was the Town's "number one bread and butter," "preservation" was "very, very important," and she was "trying to visualize as I'm driving in as a tourist into the Town of Mesilla what is it that we're looking for and what is it that we want to present to people coming into the Town of Mesilla?" (*Id.* at 328.) The Mayor Pro Tem referred to Section 18.85.090 of the Mesilla Town Code ("MTC"), which she stated prohibits special use permits for commercial use.[7] (*Id.*) She also referred to Section 18.20.040(B), which

---

[7] The Mayor Pro Tem did not accurately describe Section 18.85.090 which, as discussed in greater detail below, actually provides that the PZHAC "shall recommend or disapprove" special use permits for, *inter alia*, "any use which . . . [c]an be specifically classified as a . . . commercial . . . use." (Doc. 9-2 at 25.)

prohibits commercial uses in the Rural Farm ("RF") zone, and Section 18.20.50(D), which sets a maximum height of 30 feet for structures in that zone. (*Id.*; Doc. 9-2 at 5.) Mr. Gutierrez responded that Plaintiff was applying under Section 18.60.210, which he stated authorized Plaintiff to construct a single-user commercial cell phone tower of up to 65 feet.[8] (Doc. 10-1 at 328-29.)

The Mayor Pro Tem voted to disapprove Plaintiff's application "based on ordinance 18.20 and 18.85 and 18.54 and the documentation lacking, and finally, in support of the concerns of the residents." (*Id.* at 330.) Trustee Garcia voted to disapprove "due to the ordinance of 18.20, 18.54, 18.85, lack of documents, as well, and the support of the residents." (*Id.*) Trustee Caro voted to disapprove "based on the same ordinances . . . , plus also concerns and also my long time and experience with electromagnetic radiation effects dealing with antennas and stuff." (*Id.*) Trustee Arzabal voted to disapprove "based on 18.20, 18.85, and 18.54, lacking documentation, and the residents having concerns." (*Id.*) No one voted in favor of the application. (*Id.*) The meeting then adjourned. (*Id.*)

The Board issued a written resolution on February 22, 2021 memorializing its denial of Plaintiff's application. (*Id.* at 331.) The resolution stated that the denial was "based on the following findings at [the Board's] February 8, 2021 meeting":

> a)      [Plaintiff] failed to justify compliance with MTC 18.20.040(B) which states that Commercial uses other than the sale of agricultural products is a prohibited use [sic] in the Rural Farm (RF) zone.
> b)      [Plaintiff] failed to justify compliance with MTC 18.20.050(D) which states that the maximum height of buildings or structures in the RF Zone shall be two stories or 30 feet, whichever is less.
> c)      [Plaintiff] failed to justify compliance with MTC 18.85.090 which states that the PZHAC shall recommend or disapprove any special use permits for any

---

[8] It appears Mr. Gutierrez intended to refer to Section 18.54.060(A) of the MTC, which permits single-user commercial cell phone towers of up to 65 feet in the RF zone. (Doc. 9-2 at 13-14.) The MTC provisions Plaintiff attached to its brief in chief do not include Section 18.60.210 of the MTC. (*See generally id.*) However, the Court takes judicial notice of that section, which governs "vertical structures" and provides that "[c]ommercial" and "[m]onopole" towers "are excluded from the C, H-C and H-R zones" and "[f]reestanding [v]ertical [s]tructures [p]ermitted by [r]ight" in the RF zone "shall not exceed" 50 feet. MTC § 18-60-210(A)(1), (A)(3), (C)(3), (D).

use which can be specifically classified as a residential, commercial, or industrial use.

(*Id.*)

Plaintiff filed this action on March 23, 2021, alleging that Defendants' denial of its special use permit application violated 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 332(c)(7)(B)(iii) of the TCA. (Doc. 1 at 21-24.) Plaintiff also appealed Defendants' zoning decision under N.M. Stat. § 39-3-1.1. (*Id.* at 24-25.)

On May 24, 2021, Plaintiff filed its Statement in support of its state law appeal. (Doc. 9.) Defendants responded to the Statement on August 4, 2021, and Plaintiff replied in support of it on August 19, 2021. (Docs. 18, 22.) On October 29, 2021, the Court ordered the parties to submit supplemental briefing on this portion of Plaintiff's appeal, which they timely did on November 12, 2021 and November 19, 2021. (Docs. 32-34.)

Plaintiff filed the Motion presently before the Court on August 30, 2021. (Doc. 29.) In it, Plaintiff seeks summary judgment on its two claims under the TCA. (*See generally id.*) Defendants filed a response in opposition to the Motion on September 14, 2021, and Plaintiff filed a reply in support of it on September 28, 2021. (Docs. 30, 31.) The federal questions raised in Plaintiff's Motion form the basis of the Court's subject matter jurisdiction, and the Court will therefore consider the Motion before the Statement regarding Plaintiff's state law appeal. (*See* Doc. 1 at 2-3 (citing 28 U.S.C. §§ 1331 and 1367 to allege subject matter jurisdiction).)

## II.   <u>Analysis</u>

### A.   **Plaintiff is entitled to summary judgment on its claim that Defendants' written decision violated 47 U.S.C. § 332(c)(7)(B)(iii) of the TCA.**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (quotation marks omitted). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The TCA

limits the decision-making authority of local government bodies regarding the placement of wireless communications facilities. While Congress expressly preserved local zoning authority over the construction of personal wireless service facilities when it enacted the TCA, Congress adopted the TCA in order to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies. The TCA furthered these goals by reducing the impediments that local governments could impose to defeat or delay the installation of wireless communications facilities such as cell

phone towers, and by protecting against irrational or substanceless decisions by local authorities.

*T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty., Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008) ("*Wyandotte County*") (citations and quotation marks omitted). In other words, the TCA restricts but does not eliminate local governments' authority to regulate the construction of cell phone towers. *Id.*

Plaintiff's federal claims are based on the restrictions set forth in 47 U.S.C. § 332(c)(7)(B)(iii) and 47 U.S.C. § 332(c)(7)(B)(i)(II). (Doc. 1 at 21-24.) Section 332(c)(7)(B)(iii) "requires that any decision by a local government 'to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.'" *Wyandotte County*, 546 F.3d at 1306 (quoting 47 U.S.C. § 332(c)(7)(B)(iii)). Section 332(c)(7)(B)(i)(II), in turn, "provides that local governments must not make decisions that 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *Id.* (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)). In accordance with Tenth Circuit precedent, *id.*, the Court will consider Plaintiff's claim based on Section 332(c)(7)(B)(iii) first.

"[T]he 'substantial evidence' standard of section 332 is the traditional standard employed by the courts for review of agency action." *U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla.*, 180 F. App'x 791, 794 (10th Cir. 2006) ("*City of Seminole*"). Although review under this standard is "quite narrow," it is not a "rubber stamp." *Wyandotte County*, 546 F.3d at 1306-07 (quoting *U.S. Cellular Tel. of Greater Tulsa L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003)).

> Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla but less than a preponderance. The possibility of drawing two competing conclusions from the evidence does not prevent a finding of substantial evidence. While a reviewing court has no power to substitute its own conclusions for those of the fact-finder, if the record as a whole

contains conflicting evidence, the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence.

*Id.* at 1307 (brackets, quotation marks, and citations omitted).

Substantial evidence review under Section 332(c)(7)(B)(iii) does not involve consideration of "the substantive federal standards imposed by the TCA." *Id.* Rather, the court must "look to the requirements set forth in the local zoning code to determine the substantive criteria to be applied in determining whether substantial evidence existed to support the [locality's] decision." *Id.* Thus, if a local government "invent[s] a criterion for which the applicable local ordinances [do] not provide," it "fail[s] to act on the basis of substantial evidence." *Id.* at 1308. Rather, "to be supported by substantial evidence, the proffered reasons must comport with the objective criteria in existence." *Id.* at 1308, 1310 (brackets omitted) (holding that locality erred by relying on criteria with "no basis" in its code). "Stated another way, [the Court] may not overturn the Board's decision on substantial evidence grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence." *City of Seminole*, 180 F. App'x at 803–04 (quotation marks omitted).

Section 332(c)(7)(B)(iii) requires localities to "provide reasons when they deny telecommunication companies' applications to construct cell phone towers." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 295 (2015) ("*City of Roswell*"). Although these reasons "need not appear in the written denial letter or notice provided by the locality," they must "appear in some . . . written record[,]" be "clear enough to enable judicial review[,]" and be "provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice." *Id.* at 295, 302. A locality may not "provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." *City of Seminole*, 180 F. App'x at 794 (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 21 (1st Cir. 2002)

("*National Tower*")); *see also Nextel W. Corp. v. Town of Edgewood, New Mexico*, 479 F. Supp. 2d 1219, 1231–32 (D.N.M. 2006) ("*Nextel West*") ("[T]he Court cannot affirm the denial of an application by supplying a reason for that denial which is not contained in the local zoning authority's own written decision.").

Here, the Board undisputedly provided Plaintiff with a written decision setting forth reasons for denying Plaintiff's application.[9] Specifically, as discussed above, the Board stated that the denial was based on its findings that Plaintiff did not "justify compliance" with Sections 18.20.040(B), 18.20.050(D), and 18.85.090 of the MTC. (Doc. 10-1 at 331-32.) Pursuant to Plaintiff's claim under Section 332(c)(7)(B)(iii) of the TCA, the Court must determine whether the Board's proffered reasons are supported by substantial evidence.

Chapter 18.20 of the MTC concerns the Town's RF zone. (Doc. 9-2 at 1.) As the Board found, Section 18.20.040(B) does in fact prohibit "[c]ommercial uses other than the sale of agricultural products, the majority of which were produced on the property," in the RF zone. (*Id.* at 5.) And, Section 18.20.050(D) does limit "[t]he maximum height of buildings or structures in the RF zone" to "two stories or 30 feet, whichever is less." (*Id.*) There is no dispute that Plaintiff sought leave to build a 65-foot commercial cell phone tower in the RF zone. Thus, at first blush, Sections 18.20.040(B) and 18.20.050(D) do appear to prohibit the proposed tower as stated in the Board's resolution.

However, the resolution wholly fails to mention Chapter 18.54 of the MTC, which governs "wireless telecommunications facilities." (*Id*. at 6-7.) A table in Section 18.54.060(A) indicates the

---

[9] The PZHAC also issued a written decision setting forth its reasons for rejecting a motion to recommend approval of Plaintiff's application. (Doc. 10-1 at 100, 297-98.) However, under Chapter 18.85 of the MTC, once Plaintiff appealed to the Board, the PZHAC's decision was stayed; the Board was required to hold a *de novo* hearing and "announce its findings and decision by resolution . . . which shall state the facts and reasons which, in the opinion of the board of trustees, make the granting or denial of the . . . special use permit necessary"; and, the Board's decision became the Town's final decision on Plaintiff's application. (Doc. 9-2 at 27-28.) Thus, the Board's resolution denying Plaintiff's application is the operative written decision before the Court.

zones in which cell phone towers are "prohibited," the zones in which they are allowed "[f]or noncommercial use only," and, for zones in which they are allowed, their maximum heights. (*Id.* at 13-14.) Significantly, the table sets a maximum height of 65 feet for single-user cell phone towers in the RF zone and does not limit such towers to noncommercial use.[10] (*Id.*)

Notwithstanding Defendants' bald assertion to the contrary, (Doc. 30 at 16), Sections 18.20.040(B) and 18.20.050(D) plainly conflict with Section 18.54.060(A). Sections 18.20.040(B) and 18.20.050(D) prohibit non-agricultural commercial uses and structures higher than 30 feet in the RF zone, while Section 18.54.060(A) allows single-user commercial cell phone towers of up to 65 feet in that zone. (*Compare* Doc. 9-2 at 5 *with id.* at 13-14.) Sections 18.20.040(B) and 18.20.050(D) prohibit Plaintiff's proposed tower, but Section 18.54.060(A) permits it provided other applicable code provisions are satisfied.

As noted above, to be supported by substantial evidence under the TCA, a locality's decision cannot be based on "a criterion for which the applicable local ordinances [do] not provide[.]" *Wyandotte County*, 546 F.3d at 1308; *see also Crown Castle Fiber LLC v. City of Charleston*, No. 2:20-CV-2692-DCN, 2021 WL 538148, at *3 (D.S.C. Feb. 15, 2021) ("[t]o determine whether a local body's denial of a service provider's application comports with § 332(c)(7)(B)(iii)," court must look to whether "the local body's decision is well-rooted in applicable local law"). The Board based its denial of Plaintiff's application on Plaintiff's failure to comply with Section 18.20.040(B) and 18.20.050(D). Thus, to determine whether the Board's decision survives substantial evidence

---

[10] The table also indicates that cell phone towers in all other zones are either "[e]xpressly prohibited" or "[f]or noncommercial use only," though "[o]ther [c]ommunication [s]tructures" are permitted in the C zone if they are "concealed" in accordance with Section 18.54.060(D). (*Id.*) Consistent with Section 18.54.060(A), Section 18.60.210 regulates "vertical structures" generally and excludes "[c]ommercial towers" from "the C, H-C and H-R zones," but not the RF zone. MTC § 18.60.210(A)(1). Less consistently, Section 18.60.210 also limits "[f]reestanding [v]ertical [s]tructures [p]ermitted by [r]ight" in the RF zone to 50 feet. MTC § 18.60.210(D). This appears to be why Plaintiff applied for a special use permit to build its proposed 65-foot tower. (Doc. 10-1 at 328.)

review under the TCA, the Court must determine which provisions govern Plaintiff's application, *i.e.*, Sections 18.20.040(B) and 18.20.050(D) on the one hand, or Section 18.54.060(A) on the other.

Under both federal and New Mexico law, it is a "well established canon of statutory interpretation" that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see also, e.g.*, *Albuquerque Commons P'ship v. City Council of City of Albuquerque*, 2011-NMSC-002, ¶ 24, 149 N.M. 308, 314, 248 P.3d 856, 862 ("Specific provisions govern over general provisions."); *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 15, 146 N.M. 24, 30, 206 P.3d 135, 141 ("[G]eneral language in a statute is limited by specific language."). Indeed, "[i]t is a fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect." *Sierra Club-Black Hills Grp. v. U.S. Forest Serv.*, 259 F.3d 1281, 1287 (10th Cir. 2001) (quotation marks omitted); *see also Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); *De Baca v. United States*, 399 F. Supp. 3d 1052, 1184 (D.N.M. 2019), *aff'd sub nom. Ohlsen v. United States*, 998 F.3d 1143 (10th Cir. 2021) (same) (emphasis omitted).

As the United States Supreme Court has explained, "[t]he general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645; *see also, e.g.*, *New Mexico v. Farish*, No. S-1-SC-36638, 2021 WL 4165156, at *6 ¶ 22 (N.M. Sept. 13, 2021) ("[W]e treat the specific statute as an exception to the general statute[.]") (quotation marks omitted); *Albuquerque Commons P'ship*, 2011-NMSC-002 at ¶ 23, 149 N.M. at 314, 248 P.3d at

862 ("[A] statute dealing with a specific subject will be considered an exception to, and given effect over, a more general statute.").

> The specific statute operates as an exception to the general statute because the Legislature is presumed not to have intended a conflict between two of its statutes and because the Legislature's attention is more particularly directed to the relevant subject matter in deliberating upon the special law.

*New Mexico v. Santillanes*, 2001-NMSC-018, ¶ 7, 130 N.M. 464, 467–68, 27 P.3d 456, 459–60 (quotation marks omitted).

Here, the MTC's more specific provision permitting commercial single-user cell phone towers of up to 65 feet in the RF zone contradicts the code's more general prohibition against commercial structures higher than 30 feet in that zone. (Doc. 9-2 at 5, 13-14.) As such, the general/specific canon indicates that the Court should construe the more specific permission in Section 18.54.060(A) as an exception to the more general prohibitions in Sections 18.20.040(B) and 18.20.050(D) and find that Section 18.54.060(A) controls. *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645; *Albuquerque Commons P'ship*, 2011-NMSC-002 at ¶¶ 23-24, 149 N.M. at 314, 248 P.3d at 862. Or, phrased in the negative, the Court should *not* construe Sections 18.20.040(B) and 18.20.050(D) to eviscerate Section 18.54.060(A).[11] *Sierra Club-Black Hills Grp.*, 259 F.3d at 1287.

"Of course the general/specific canon is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction." *RadLAX Gateway Hotel, LLC*, 566 U.S. at 646–47; *see also, e.g.*, *Farish*, 2021 WL 4165156 at *6 ¶ 22 (general/specific canon applies "when there is no clear expression of legislative intent to the contrary") (quotation marks omitted). However, Defendants have pointed to nothing

---

[11] Plaintiff also argues that Section 18.54.060(A) controls over Sections 18.20.040(B) and 18.20.050(D) because Section 18.54.060(A) was enacted later in time. (Doc. 29 at 18 & n.78.) The Court declines to rely on this argument because neither the record nor the MTC clearly indicates which of these subsections was enacted last. Section 18.20.040 and 18.20.050 were enacted in 1994 and Section 18.54.060 in 2003; however, Section 18.20.050 was amended twice in 2004. (Doc. 9-2 at 5, 16; Doc. 29 at 18 & n.78.)

in the record suggesting that the Town intended Sections 18.20.040(B) and 18.20.050(D) to override Section 18.54.060(A); and, the Court's review has uncovered no such evidence or authority.[12] The Court therefore concludes that Section 18.54.060(A) is intended to "operate[] as an exception to [Sections 18.20.040(B) and 18.20.050(D)]," because the Town "is presumed not to have intended a conflict" between its ordinances and because its "attention [was] more particularly directed to the relevant subject matter"—in this case, zoning and height restrictions on commercial cell phone towers—"in deliberating upon" Section 18.54.060(A). *Santillanes*, 2001-NMSC-018 at ¶ 7, 130 N.M. at 467–68, 27 P.3d at 459–60. In these circumstances, by citing Plaintiff's failure to comply with Sections 18.20.040(B) and 18.20.050(D) to justify its denial of Plaintiff's application, the Board relied on criteria for which the MTC did not provide and so failed to act on the basis of substantial evidence. *Wyandotte County*, 546 F.3d at 1308.

The third provision on which the Board relied to justify its denial of Plaintiff's application—Section 18.85.090(C) of the MTC—also fails to support the Board's decision. As the Board expressly acknowledged, Section 18.85.090(C) of the MTC provides that the PZHAC "*shall recommend or disapprove* any special use permits for any use which . . . can be specifically classified as a . . . commercial . . . use." (Doc. 9-2 at 25 (emphasis added); *see* Doc. 10-1 at 331.) Thus, Section 18.85.090(C) imposed no substantive requirements on Plaintiff's application for a special use permit. Rather, it merely directed the PZHAC to recommend or disapprove the application, as in fact it did. Thus, Section 18.85.090(C) also fails to supply an objective criterion supporting the Board's denial of Plaintiff's application. *Wyandotte County*, 546 F.3d at 1308.

---

[12] On the contrary, the PZHAC's finding that "[t]he zoning code allows this type of use in the RF zone" tends to confirm that Section 18.54.060(A) operates as an exception to Sections 18.20.040(B) and 18.20.050(D). (Doc. 10-1 at 298.)

Defendants appear to recognize that none of the Board's written reasons for denying Plaintiff's application are valid, arguing instead that the Court's substantial evidence review is not limited to these reasons. (Doc. 30 at 16.)  Specifically, Defendants argue that "[t]he test is not whether substantial evidence supports [the] stated reasons for the decision. Instead[,] the test here is whether the decision . . . is itself supported by substantial evidence." (*Id.*) However, Defendants cite to no authority for this proposition, (*see id.*), which is quite simply wrong. As noted above, the Tenth Circuit has specifically held that a locality may not "provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." *City of Seminole*, 180 F. App'x at 794.

Of course, as Defendants argue later with greater accuracy, the Court "can rely on *evidence* f[ro]m the written record supporting the [B]oard's *stated reason* for its decision, even if the [B]oard did not." (Doc. 30 at 18 (emphases added).) The Court is not suggesting that the Board was required to recite all of the evidence supporting the reasons it gave in its written decision denying Plaintiff's application. However, the Board *was* required to state all of its reasons in writing clearly enough to enable judicial review, *City of Roswell*, 574 U.S. at 302, and the Court cannot consider any "post-hoc rationales" in determining whether the Board's decision was supported by substantial evidence. *City of Seminole*, 180 F. App'x at 794 (brackets omitted). In sum, because the three reasons the Board gave in its written decision denying Plaintiff's application were not supported by substantial evidence as a matter of law, Plaintiff is entitled to summary judgment on its claim that the decision failed to comply with 47 U.S.C. § 332(c)(7)(B)(iii).

**B.     The Court will deny as moot the portion of Plaintiff's Motion seeking summary judgment on its claim under 47 U.S.C. § 332(c)(7)(B)(i)(II), as well as its appeal under N.M. Stat. Ann. § 39-3-1.1.**

In its Motion, Plaintiff also argues that it is entitled to summary judgment on its claim under 47 U.S.C. § 332(c)(7)(B)(i)(II) because the Board's denial of its application had the effect of prohibiting Plaintiff's provision of wireless services. (Doc. 29 at 12-16.) However, in *Wyandotte County*, the Tenth Circuit declined to decide whether the defendant locality's decision violated Section 332(c)(7)(B)(i)(II) after finding that it was not supported by substantial evidence under Section 332(c)(7)(B)(iii). 546 F.3d at 1306. In doing so, the Tenth Circuit quoted a Ninth Circuit decision for the proposition that, "[i]f a zoning board's decision, reached under its own rules, is not supported by substantial evidence, then we need not consider the application of the anti-prohibition . . . prong[] of the statute." *Id.* (quoting *MetroPCS, Inc. v. City & Cty. of San Francisco,* 400 F.3d 715, 724 (9th Cir. 2005), *abrogated on other grounds by City of Roswell*, 574 U.S. at 293). Likewise, here, the Court need not consider whether the Board's denial of Plaintiff's special use permit application violated Section 332(c)(7)(B)(i)(II), because it will reverse the Board's decision based on its determination that the decision was not supported by substantial evidence under Section 332(c)(7)(B)(iii).

In addition, the Court need not decide whether the Board's decision should be reversed under Section 39-3-1.1 of the New Mexico Statutes Annotated, as Plaintiff claims in its Statement. (Doc. 9.) Under New Mexico law, "[a] person aggrieved by a decision of [a] zoning authority . . . may appeal the decision pursuant to the provisions of [N.M. Stat. Ann. §] 39-3-1.1." N.M. Stat. Ann. § 3-21-9. Section 39-3-1.1, in turn, provides that courts "may set aside, reverse or remand" such a decision if it determines that the zoning authority "acted fraudulently, arbitrarily or capriciously," the decision "was not supported by substantial evidence," or the zoning authority

"did not act in accordance with law." N.M. Stat. Ann. § 39-3-1.1(D). Given the similarities between 47 U.S.C. § 332(c)(7)(B)(iii) and Section 39-3-1.1(D), it seems likely the Board's decision would be subject to reversal under both provisions. However, the Court need not decide whether there are any applicable differences between them, because reversal under the state statute would be redundant. Instead, the Court will deny as moot both the portion of Plaintiff's Motion regarding its claim under 47 U.S.C. § 332(c)(7)(B)(i)(II) and Plaintiff's appeal under Section 39-3-1.1. The denial will be without prejudice to Plaintiff's ability to reassert these claims if warranted when the case resumes after remand, as further explained in Section II.C., below.

**C.     The appropriate remedy in this case is remand for a short, finite interval**.

Finally, the Court must determine the appropriate remedy for Defendants' violation of 47 U.S.C. § 332(c)(7)(B)(iii). Plaintiff argues that it is entitled to declaratory and injunctive relief requiring Defendants to grant it permission to build the proposed tower.[13] (Doc. 29 at 21; Doc. 31 at 11-12.) Defendants, on the other hand, assert that Plaintiff has presented no legal basis for the requested relief, and that, "[a]t most the Court should remand this matter to Mesilla's Board of Trustees with instructions for the parties to develop a more comprehensive record which supports the respective position[s] of the parties." (Doc. 30 at 20-21.) As explained below, in the unusual

---

[13] In its Motion, Plaintiff also requests an award of "costs, expenses, and attorneys' fees as allowed by law." (Doc. 29 at 22.) However, Plaintiff cites to no authority in support of this request. (*See id.*) Moreover, Plaintiff did not defend the request in its reply, even though Defendants specifically observed in their response that Plaintiff had "fail[ed] to present any argument or authority" to support it. (Doc. 30 at 20; *see generally* Doc. 31.) The Court therefore finds that Plaintiff has forfeited the point and will deny its request for an award of costs, expenses, and attorney fees at this juncture. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.") (brackets omitted) (quoting *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)).

circumstances of this case, the Court finds that the appropriate remedy is remand for a short, finite interval.

"[T]he TCA does not provide a statutory remedy for a violation of its provisions[.]" *City of Seminole*, 180 F. App'x at 794. Nevertheless, courts have uniformly held that "injunctive relief is an appropriate remedy for violations of the TCA's procedural requirements." *Id.* (brackets omitted); *see also, e.g.*, *Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1221 (11th Cir. 2002) ("*Preferred Sites*") ("A number of courts have . . . held an injunction (or other equitable relief) in the form of an order to issue the relevant permits is a proper form of relief under [the TCA]."). "The decision of whether to grant equitable relief under the TCA is a matter left to the discretion of the district court." *City of Seminole*, 180 F. App'x at 794; *see also Preferred Sites*, 296 F.3d at 1220 ("The grant of equitable relief is a matter of judicial discretion.").

However, it is not entirely clear how far this Court's remedial discretion extends. The parties have not identified, and the Court has not located, any Tenth Circuit decision on this specific point, and other courts' decisions suggest that the TCA constrains the Court's discretion to some degree. In *National Tower,* 297 F.3d at 14, the First Circuit discussed the appropriate remedy for TCA violations at some length. The *National Tower* court began by observing that the analogy between appeals from federal agency decisions and appeals from local decisions under the TCA "has its limits[.]" *Id.* at 21. In particular, the First Circuit concluded that Congress did not mean to grant as much deference to local governments "as a federal agency receives, nor to give them new policymaking authority under the [TCA]." *Id.*

The First Circuit also pointed out that the TCA requires localities to "act within 'a reasonable period of time,'" and requires reviewing courts to hear appeals "'on an expedited basis.'" *Id.* (quoting 47 U.S.C. § 332(c)(7)(B)(ii), (v)). In the *National Tower* court's view, these provisions

indicate that Congress did not intend multiple rounds of decisions and litigation, in which a court rejects one reason and then gives the [locality] the opportunity, if it chooses, to proffer another. Instead, in the majority of cases the proper remedy for a zoning board decision that violates the Act will be an order . . . instructing the board to authorize construction.

*Id.* at 21-22. Applying this reasoning to the case before it, the First Circuit added, "[w]hile we can conceive of circumstances in which a remand may be in order—for example, an instance of good faith confusion by a board that has acted quite promptly—this case is not a candidate for remand to the board." *Id.* at 24.

Relying on similar reasoning, several courts have held that, where remand would serve no useful purpose, injunctive relief compelling a locality to grant the requested permit is the appropriate remedy under the TCA. *See, e.g.*, *Tenn. ex rel. Wireless Income Properties, LLC v. City of Chattanooga*, 403 F.3d 392, 399-400 (6th Cir. 2005); *Brehmer v. Plan. Bd. of Town of Wellfleet*, 238 F.3d 117, 121 (1st Cir. 2001); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 409–10 (3d Cir. 1999); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999). Likewise, courts in this District have declined to remand TCA appeals "in light of [the d]efendants' previous delays and inconsistencies in handling [the p]laintiff's application," *Nextel West*, 479 F. Supp. 2d at 1238, and where the record did not "reflect[] any legitimate basis for a denial" of the plaintiff's application. *W. PCS II Corp. v. Extraterritorial Zoning Auth. of City & Cty. of Santa Fe*, 957 F. Supp. 1230, 1237 (D.N.M. 1997) ("*City & County of Santa Fe*").

Conversely, two decisions from other districts illustrate circumstances in which courts have found remand to be the appropriate remedy. In *AT & T Wireless Services of Florida, Inc. v. Orange County*, 982 F. Supp. 856 (M.D. Fla. 1997) ("*Orange County*"), the court found that the defendant county's failure to provide even "the most rudimentary explanation" in its written denial of the plaintiff's application violated the TCA. *Id.* at 859. However, the court added that the defendant

county had "found that the application [did] *not* comply with" its code "and has not met the requirements for a special exception." *Id.* at 861 (emphasis in original). Acknowledging that the county's "conclusion may [have] be[en] in error," the court nevertheless determined that

> [d]ue regard for the preserved 'authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities' under Section 332(c)(7) of the Act, includes appropriate deference to the traditional decision[-]making prerogatives of local governments.

*Id.* (quoting 47 U.S.C. § 332(c)(7)(A)).

"Given the traditional judicial deference accorded to local land use regulations," the *Orange County* court concluded that "[a]n injunction mandating the issuance of a special exception" would be "inappropriate" on the record before it. *Id.* at 862. Instead, the court allowed the defendant county 35 days to provide written findings based on substantial evidence in a written record, after which the court would perform its expedited review of the merits under the TCA. *Id.* In addition, the court cautioned the defendant that, should it "fail to provide the written findings, or should the findings fail to be supported by written substantial evidence, the [c]ourt may order an immediate approval of the application[.]" *Id.*

Similarly, in *PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F. Supp. 2d 1052 (N.D. Ill. 1998) ("*Village of Fox Lake*"), the court found that the defendant village's denial of the plaintiff's application was "in writing" but was not supported by substantial evidence.[14] *Id.* at 1061-66. Specifically, the court found the village's record to be "woefully inadequate" and lacking in "hard evidence" to support its reasons for rejecting the application. *Id.* at 1064-65. Nevertheless, citing comity and the TCA's "explicit reservation of zoning authority to state and

---

[14] However, the Supreme Court's holding in *City of Roswell* that a locality must provide written reasons for denying an application supersedes the *Village of Fox Lake* court's holding to the contrary. *Compare City of Roswell*, 574 U.S. at 295, 302, *with Village of Fox Lake*, 26 F. Supp. 2d at 1061.

local governments," and noting the then-unsettled law regarding the scope of the Act's "in writing" requirement, the court denied the plaintiff's request for a writ of mandamus. *Id.* at 1066. Instead, the court declared the village's decision to be in violation of Section 332(c)(7)(B)(iii), remanded "for further action in conformity with [its] opinion," allowed the village 60 days to hold additional hearings and decide the application on an expanded record, and retained jurisdiction to enforce its judgment. *Id.*

Likewise, three factors convince the Court that this case falls outside "the majority of cases," *National Tower*, 297 F.3d at 21, such that remand for a short, finite interval will preserve the TCA's "explicit reservation of zoning authority to state and local governments," *Village of Fox Lake*, 26 F. Supp. 2d at 1066, and serve a useful purpose. **First**, Defendants decided Plaintiff's application within four months of its submission and thus "within a reasonable period of time" under Section 332(c)(7)(B)(ii). (Doc. 10-1 at 20, 331); *see City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 295, 307 (2013) (upholding FCC declaratory ruling that a "reasonable period of time" under Section 332(c)(7)(B)(ii) is presumptively 150 days for applications other than those to place an antenna on an existing tower). Thus, this case is not like *Nextel West*, in which the court referenced the defendants' "previous delays" in handling the plaintiff's application in denying remand. 479 F. Supp. 2d at 1238; *see also National Tower*, 297 F.3d at 24 ("circumstances in which a remand may be in order" include "a board that has acted quite promptly").

**Second**, due to certain defects and procedural irregularities, the record below fails to affirmatively demonstrate Plaintiff's entitlement to a special use permit under the MTC. Initially, it appears that the Board generally places witnesses under oath before receiving their testimony at hearings on appeals from PZHAC recommendations. (*See* Doc. 10-1 at 310, 319, 324); *see also* N.M. Stat. Ann. § 3-21-8(A) (providing that "[t]he zoning authority shall provide by resolution the

procedure to be followed in considering appeals" of zoning commission decisions); *Wyandotte County*, 546 F.3d at 1307 (to satisfy substantial evidence review under the TCA, "the fact-finder must adequately explain its reasons for rejecting or discrediting *competent evidence*") (emphasis added). Here, however, there is no record that the Town Clerk administered an oath to anyone who spoke at the Board hearing on Plaintiff's application until shortly before the hearing's conclusion. (Doc. 10-1 at 324.) As a result, the statements of Plaintiff's representative in support of the application are largely unsworn.[15] (*Compare id.* at 319-23 *with id.* at 325-29.)

Further, it appears Plaintiff may have failed to submit certain required documentation to the Board before its hearing on Plaintiff's application. Section 18.54.040(J) of the MTC requires a wireless provider seeking leave to build a new cell phone tower to provide

> an inventory of existing towers, antennas or sites approved for towers or antennas that are located within the service area proposed to be served by the new tower, including specific information about the location, height and design, and the owners/operators of each tower or site and indicate the distance of such towers, antennas or sites from the proposed [tower].

(Doc. 9-2 at 11.) Section 18.54.070(C) of the MTC requires a wireless provider seeking a special use permit to build a new tower to submit "documentation that demonstrates the need for the [tower] to provide service within the geographical area proposed to be serviced by such [tower]. The documentation shall include propagation studies of the proposed site and all adjoining planned, proposed, in-service or existing sites." (*Id.* at 18.) Additionally, one of the "goals" of Chapter 18.54 is to "[s]trongly encourage the joint use of new and existing tower sites as a primary option rather than construction of additional single-use towers," (*id.* at 7); Section 18.54.050 provides that, "[t]o minimize adverse visual impacts associated with the proliferation and clustering of towers, co-

---

[15] Although Mr. Gutierrez's statements before the PZHAC were evidently sworn, (Doc. 10-1 at 99), there is no verbatim record of these statements; and, according to Section 18.85.240 of the MTC, the hearing before the Board was *de novo*. (Doc. 9-2 at 28.) Further, although Mr. Shannon incorporated his earlier statements into his oath when he was finally sworn in before the Board, Mr. Gutierrez did not. (Doc. 10-1 at 324.)

location or shared use of antennas by more than one carrier on existing towers shall take precedence over the construction of new towers[,]" (*id.* at 13); and, Section 18.54.070(B)(18) requires applicants to submit "[a] written report indicating the applicant's efforts to secure shared use or co-location with existing towers[ or] other structures[.]" (*Id.* at 18.)

At the hearing before the Board, the Mayor Pro Tem stated she could not find "[t]he documentation for all adjoining, planned, proposed, in service, and existing sites" or "supporting documentation that explains why [the proposed site is] the best site" in the paperwork submitted to the Board. (Doc. 10-1 at 325.) Mr. Gutierrez's responses to the Mayor Pro Tem's inquiry were inconsistent. Initially he admitted that this documentation "may not have been included." (*Id.*) However, after explaining that Plaintiff's package included color maps showing "Las Cruces area with no coverage," "the new cell tower coverage," and "the coverage needed," as well as "some photo simulations," Mr. Gutierrez contended that the missing documentation "was included in [Plaintiff's] original application" to the PZHAC. (*Id.*) Mr. Shannon and the Town Clerk subsequently indicated that everything submitted to the PZHAC was also submitted to the Board. (*Id.* at 326.)

In this regard, the Court notes that the record on appeal includes three color maps purporting to show Plaintiff's "Las Cruces area coverage with no LSC_La Posta," "Las Cruces La Posta coverage," and "Area coverage with LSC_La Posta added," as well as four photo simulations of the proposed tower viewed from each cardinal point. (*Id.* at 23-27.) However, these documents do not appear to satisfy all of the documentary requirements discussed above. For example, the maps alone do not appear to demonstrate that the proposed tower is needed to fill a "coverage gap," as Plaintiff has repeatedly alleged; to the untrained eye, they seem to show no difference between coverage with the proposed tower and coverage without it. (*Compare id.* at 23 *with id.* at 25.) Nor

do they satisfy the MTC's specific requirements for an "[i]nventory of [e]xisting [s]ites" and "[a] written report indicating [Plaintiff's] efforts" to obtain the desired coverage by "shared use or co-location with existing towers," (Doc. 9-2 at 11, 18), even though the record suggests there are other towers near the proposed site.[16] (*See, e.g.,* Doc. 10-1 at 310, 313, 320, 322.) In light of these defects in the record, remand would serve the useful purpose of allowing the parties to supplement the record with properly authenticated testimony and more complete documentation regarding whether Plaintiff is entitled to a special use permit under the MTC.

As a **third** and final factor supporting remand in this case, the record contains material suggesting that, depending on the evidence offered on remand, Defendants could lawfully deny Plaintiff's application. For example, "aesthetics can be a valid ground for local zoning decisions" under the TCA if there is "substantial evidence of the visual impact of the tower," as opposed to "[m]ere generalized concerns regarding aesthetics[.]" *Wyandotte County*, 546 F.3d at 1312. According to the Tenth Circuit, "beautification efforts, neighbor complaints, [and] the actual character of the immediate neighborhood" are "concerns grounded in the specifics of [the] case" that may be sufficient to support denial of a permit under the TCA. *Id.*

Here, the record includes neighbors' aesthetic objections that, though unsworn, are grounded in the specifics of the case; in fact, the PZHAC relied on similar, sworn objections in its written decision. (Doc. 10-1 at 99-100, 297-98.) For example, one of the owners of the property next door to the proposed site observed that "[a] 65-foot tower is going to be enormous compared to the pecan trees it's next to." (*Id.* at 312.) The Court will refrain from further comment on the

---

[16] Although the color maps do appear to show the location and coverage of Plaintiff's existing towers in the vicinity, (Doc. 10-1 at 23, 25), they do not fulfill Section 18.54.040(J)'s requirement for "specific information" about these towers' "height and design," and do not appear to provide any information about the towers of any other "owners/operators." (*See id.*; Doc. 9-2 at 11.)

validity of each side's presentations below because these presentations may change on remand, as may the stated reasons for the Board's decision and even the decision itself. However, the existence of material in the record that, if properly authenticated, could support a denial of Plaintiff's application materially distinguishes this case from *City & County of Santa Fe*, in which the record did not "reflect[] any legitimate basis for a denial" of the plaintiff's application. 957 F. Supp. at 1237. For these reasons, the Court will deny Plaintiff's request for declaratory and injunctive relief and will instead remand this matter to Defendants for reconsideration.

Nevertheless, the Court remains mindful of the TCA's purposes and time constraints and will restrict its remand accordingly. Defendants will be required to give Plaintiff the opportunity to supplement the record with documents and testimony that have been properly authenticated in accordance with the Board's usual procedures within 45 days of entry of this Order. Defendants may also supplement the record during this time period, *e.g.*, by allowing members of the public to offer properly authenticated testimony. The Board must then issue an amended written decision no later than 60 days after entry of this Order. In so doing, the Board should consider all competent evidence in the expanded record, and its amended written decision should (a) state each reason for the decision clearly enough to enable judicial review, (b) not have the effect of prohibiting Plaintiff's provision of wireless services, and (c) otherwise comply with the TCA. Within 15 days of the issuance of the Board's amended written decision, the parties will be required to file a joint status report that includes the parties' joint or separate proposals regarding how the case should proceed in light of the expanded record and the Board's amended written decision. The Court will retain jurisdiction over the case to enforce the terms of this Order and to review the Board's amended written decision should Plaintiff seek such review when the case resumes after remand.

III.     **Conclusion**

IT IS THEREFORE ORDERED as follows:

1.      Plaintiff's Motion for Summary Judgment and for Expedited Treatment under 47 U.S.C. § 332(c)(7)(B)(v) (Doc. 29) is GRANTED IN PART, in that the Court grants Plaintiff summary judgment on its claim that the Board's February 22, 2021 written denial of Plaintiff's October 21, 2020 application for a special use permit to construct a cell phone tower violated 47 U.S.C. § 332(c)(7)(B)(iii) because it was not supported by substantial evidence.

2.      Defendants' denial of Plaintiff's application is therefore REVERSED and this matter is REMANDED to Defendants with the following instructions. Defendants shall give Plaintiff the opportunity to supplement the record within 45 days of entry of this Order. Defendants may also supplement the record during this time. The Board shall then issue an amended written decision no later than 60 days after entry of this Order that complies with the requirements set forth herein. Within 15 days of issuance of the Board's amended written decision, the parties shall file a joint status report that includes the parties' joint or separate proposals regarding how the case should proceed in light of the expanded record and the Board's amended written decision.

3.      The portions of Plaintiff's Motion (Doc. 29) requesting declaratory and injunctive relief and an award of attorney fees, costs, and expenses are DENIED WITHOUT PREJUDICE to Plaintiff's ability to reassert these requests, if warranted, when the case resumes after remand.

4.      The portion of Plaintiff's Motion (Doc. 29) regarding its claim under 47 U.S.C. § 332(c)(7)(B)(i)(II), and Plaintiff's appeal under N.M. Stat. Ann. § 39-3-1.1, are DENIED AS MOOT WITHOUT PREJUDICE to Plaintiff's ability to reassert these claims, if warranted, when the case resumes after remand.

5.      The Court retains jurisdiction over this case to enforce the terms of this Order and to review the Board's amended written decision should Plaintiff seek such review when the case resumes after remand.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE